MAINE SUPREME JUDICIAL COURT                      Reporter of Decisions
Decision:      2015 ME 136
Docket:        Cum-15-63
Submitted
 On Briefs:    July 23, 2015
Decided:       October 22, 2015

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and
               HUMPHREY, JJ.

ARN H. PEARSON

v.

MARY LOU WENDELL


HJELM, J.

[¶1]  In this high-conflict case, Arn H. Pearson appeals from a judgment of divorce from Mary Lou Wendell issued by the District Court (Portland, *Eggert, J.*). Pearson argues that the court erred by (1) awarding Wendell sole parental rights and responsibilities affecting the parties' three minor children; (2) failing to properly apply statutory factors, *see* 19-A M.R.S. § 951-A(5) (2014), in its award of spousal support to Wendell; and (3) awarding attorney fees to Wendell.  Finding no error, we affirm the judgment.

## I. BACKGROUND

[¶2]  The challenges faced by the court, which are central to an examination of Pearson's contentions on appeal, are best illustrated by reviewing some of the four-year history of litigation and the court orders spawned by the parties' general

2

inability or unwillingness to make mutually agreeable decisions for the benefit of their children. We view the following facts in the light most favorable to the court's judgment. *See Young v. Young*, 2015 ME 89, ¶ 2, --- A.3d ---.

[¶3] The parties were married in 1991 and are the parents of three children: a child born in 2001, and twins born in 2004. After he separated from Wendell by leaving the family home, in November 2011 Pearson filed a complaint for divorce in the District Court (Ellsworth), and, at the parties' request, the court (*Laskey, M.*) promptly appointed a guardian ad litem to represent the children's best interests. In January 2012, by agreement of the parties, the court issued an interim order providing, in effect, that the children's primary residence would be with Wendell but that parental rights and responsibilities would be shared, directing Pearson to pay Wendell $3,500 per month in spousal support, and addressing ongoing financial issues.

[¶4] By May, Wendell had filed a motion to enforce several of the financial aspects of the January interim order, Pearson had filed a motion for Wendell to be held in contempt for interfering with his relationship with the children, and each party had filed a complaint for protection from abuse against the other. In early June, after the court (*Mallonee, J.*) continued the hearing on the motions due to a scheduling conflict involving Pearson's attorney, the parties agreed to an order establishing parental contact and regulating their interactions pending any

subsequent agreement or court order. The interim order included prohibitions against "swear[ing] at, insult[ing] or threaten[ing] the other" and discussing marital conflicts in the children's presence, and it required the parties to take steps to secure a parenting coordinator, *see* 19-A M.R.S. § 1659 (2012).[1] The parties also agreed to dismiss their complaints for protection orders. Several weeks later, after a contested hearing on the parties' motions, the court found Wendell in contempt with respect to parental rights and responsibilities, but provided her with the opportunity to purge the contempt "by strictly adhering" to the court-ordered contact schedule.

[¶5] Subsequently, the court bifurcated the parental rights issues from the parties' financial dispute, in apparent response to a motion filed by Pearson where he argued the pressing need to address the former but recognized the parties' unreadiness to litigate the latter.[2] In January 2013, the court held what was intended to be a final hearing on issues affecting parental rights and responsibilities. The court issued a judgment on March 14, granting the parties a divorce. Addressing the parenting issues, the court found that "since the parties' separation, there has been no functional parental cooperation." While the court attributed blame to both parties, it found that Wendell bore "the vast, vast majority

---

[1] Title 19-A M.R.S. § 1659 was later repealed by P.L. 2009, ch. 345, § 2 (effective Jan. 1, 2014).

[2] The record does not include an order expressly adjudicating Pearson's motion, but the judgment subsequently issued by the court makes clear that it bifurcated the issues as he had requested.

4

of responsibility for the lack of parental cooperation." The judgment provided that the parties were to share many parental rights and responsibilities, except that Pearson would have sole authority to make decisions to secure mental health services for the children and to make medical decisions to address one child's diagnosed ADHD, but ordered Pearson to schedule a comprehensive psychological examination for that child. The court further ordered both parties to submit to a comprehensive parenting capacity evaluation and, again, to secure a parenting coordinator, and it established behavioral standards for the parties to help insulate the children from their conflict. Finally, in a supplemental order, the court awarded primary residence of one child to Pearson and the other two children to Wendell, and established a detailed schedule for parent-child contact.

[¶6] Approximately one month later, in April 2013, Pearson filed motions to enforce and for contempt, alleging that Wendell had violated the parental rights provisions in the divorce judgment. The court ordered a prompt hearing, and in a June 18 order, it found Wendell in contempt for interfering with the children's mental health treatment and with Pearson's right to make medical decisions affecting the child with ADHD. The court declined to impose remedial or punitive sanctions but indicated that if Wendell engaged in further contemptuous conduct, sanctions would be "likely."

[¶7]   In September 2013, both parties moved to modify the judgment on parental rights that had been issued only months earlier.  Pearson's motion alleged that Wendell was engaging in "irrational behavior . . . rais[ing] serious questions about her ability to provide a stable and nurturing environment for the children."  Wendell's motion asserted, among other things, that Pearson's "focus is more on the power and control given him by the Court's order than on doing what is best for the children."  Responding to the cross-motions to modify and an increasing accumulation of other motions, the court issued a procedural order, noting that "[b]oth the substance and the tone of these pleadings suggest ongoing chaos in the children's lives that must be addressed immediately."

[¶8]   The court held a two-day hearing in October 2013 on the parties' cross-motions to modify.  In the resulting order, the court found, "The children are in serious distress, and there is currently no effective system of coparenting or parental communication."  Importantly for purposes of this appeal, the court also stated, "Judicial efforts to alleviate the children's distress have been ineffective thus far."  The court then found both parties to be at significant fault for creating a damaging environment for the children.  Specifically, the court found that Wendell had violated the court's prior orders by interfering with medical decisions and not honoring the contact schedule, and that Pearson "ha[d] more than once transgressed the bounds of good parenting."  Nonetheless, the court noted that the

children continued to be "strongly connected" to both parties. The court granted Pearson sole parental rights and responsibilities, with contact between Wendell and the children at specified times, and ordered that the children be transferred from one party to the other at a police station or through a third-party intermediary that Pearson could designate.

[¶9] By this time, the parties had moved to Cumberland County. The financial issues remained to be litigated, and parenting issues were still fundamentally unsettled. In November 2013, the court held a conference with the parties, and, finding "that the children continue to be in active distress," ordered a change of venue to Portland. The parties promptly filed more motions: Pearson moved to modify aspects of the October order and filed a motion for contempt, alleging in part that Wendell was "inflict[ing] emotional cruelty on [him] through the children as punishment for prevailing in court"; and, pursuant to M.R. Civ. P. 60(b)(6), Wendell moved to vacate the March 2013 divorce judgment and to convert the judgment into an interim order because of ongoing parental rights issues. Although Pearson initially filed a written objection to Wendell's motion, in March 2014 the court (*Moskowitz, J.*) granted the motion with the parties' agreement. In its order, the court struck the grant of the divorce itself and redesignated the remaining aspects of the March 2013 order, and all subsequent orders, as interim orders.

[¶10]   The case was scheduled for a final, comprehensive hearing in July, but the court granted Wendell's motion to continue based on Pearson's failure to comply with an order to produce financial records.  The case was rescheduled for trial in September.  One week prior to that trial date, Pearson filed a petition for bankruptcy.  Although Pearson himself filed a motion in the bankruptcy proceeding for relief from the automatic bankruptcy stay, it was not clear to the court if there was an order in that case that would allow the divorce action to proceed.  The court (*Eggert, J.*) thus again continued the trial and rescheduled it to December, ordering that if the bankruptcy stay was lifted as of then, the trial would be plenary, but that otherwise, the trial would be limited to parenting disputes.

[¶11]   As the trial date approached, Pearson filed a motion in limine to restrict the evidence to events that occurred after the October 2013 order, which awarded sole parental rights and responsibilities to him.  Following from the motion in limine, at the commencement of trial on December 1, 2014, Pearson requested that the court take judicial notice of the prior findings and orders in the case.  The court ruled that because the March 2013 judgment and all subsequent orders had been converted to interim orders, the court would determine the contested issues de novo.  The court made clear, however, that it had reviewed the orders issued previously.

[¶12]  The evidence presented by the parties at the final hearing included descriptions of mental health interventions for the children; violent conduct by one child toward Pearson, resulting in damage to an item of property, personal injury to Pearson, and medical attention given to the child, with Pearson preventing Wendell from going to the hospital with the child; calls to law enforcement about issues affecting the children; the parties' mutual decision to disregard the designations of the children's primary physical residence as ordered by the court in March 2013, resulting in further conflict addressed in the October 2013 order; Pearson's decision in January 2014, without notice to Wendell, to return the children to her after he was granted sole parental rights and responsibilities in October 2013; and other events that illustrated both the parties' contentiousness and the profound instability in the children's lives.

[¶13]  On December 18, 2014, the court issued a judgment awarding sole parental rights and responsibilities to Wendell for one year.  The court based this order in part on its finding that during the pendency of the case, Pearson had been granted sole parental rights and responsibilities but ceded that role to Wendell.

> This occurred in early January 2014 and life has continued to be [in] constant turmoil for the parties and their children since that time.  The parties have been unable to cooperate as parents and they have engaged in constant warfare over the children and other divorce issues.  As a result the children do not behave well and are abusive both verbally and physically to [Pearson] and at least verbally to [Wendell].

[¶14]  The court further found that prior to the parties' separation, Wendell was the primary care provider for the children because of Pearson's work responsibilities:  "The steady parent was [Wendell] and the family was doing well as far as the development of the children went. . . . The Court finds that it is in the best interests of the children to go back to a situation [where Wendell] is the primary parent for all three children because the experiment of trying to install [Pearson] in that role has failed miserably."

[¶15]  The court ordered that during the year in which Wendell was to have sole parental rights,

> a therapeutic reunification process [shall be] guided by a counselor between [Pearson] and the parties' children and relating to the parties' ability to co-parent and the parties' ability to act in the children's best interests.  It is through this process that a contact schedule will be developed for contact between [Pearson] and the parties' children. After one year, there should be an assessment of the parties' abilities to co-parent and parties' ability to act in the children's best interests by counselors who will be involved in stabilizing the children.  If the parties are deemed able to co-parent and . . . act in the best interests of the children, co-parenting may commence, the parties shall have shared parental rights and responsibilities and a comprehensive contact schedule shall be put into effect.

The court further ordered that Wendell was to ensure that Pearson "has time with the children both together and individually."

[¶16]  In addition to ordering the therapeutic reunification process guided by a counselor, the court also directed the parties to engage in both individual and

10

co-parenting counseling that would include a parental capacity evaluation, and directed Wendell to ensure that the children engage in counseling.

[¶17] Addressing financial issues, the court ordered, among other things, that Pearson pay Wendell $3,000 per month in spousal support, and $20,000 in "attorney's fees as part of his spousal support obligation, in addition to the $10,000 earlier awarded."[3]

[¶18] Pearson moved for the court to issue further findings of fact and conclusions of law on various issues, *see* M.R. Civ. P. 52, including his contention that the judgment violated the children's constitutional rights to procedural due process because of the judgment's effect on them. In the resulting order, the court confirmed that it had considered the statutory factors in determining the children's best interests, *see* 19-A M.R.S. § 1653(3) (2014), and found,

> The key factor is that the children seemed to be doing well when [Wendell] was the primary parent for the children and not well when [Pearson] had sole parental rights and responsibilities. Shared rights and responsibilities are not an option at this time because the parents are unable to function in a joint decision making role. Therefore, the Court was left with a decision as to granting sole parental rights and responsibilities to one parent or the other. Historically, the children have done better with [Wendell] providing . . . parental leadership . . . , and [Pearson] has not been successful in that role.

---

[3] In August 2014, as the case approached a final hearing, the court (*Najarian, M.*) had ordered Pearson to pay $10,000 toward Wendell's attorney fees, but Pearson had not complied with that order as of the time of trial.

[¶19]  On the issue of spousal support, the court found that the parties had been married for more than twenty years; that Pearson, an attorney, earned around $140,000 annually, while Wendell had not earned employment income during the past ten years because she was the primary homemaker and caregiver for the children; that Wendell's support of Pearson while he was in school was greater than Pearson's similar support of Wendell; and that spousal support would constitute taxable income to Wendell but that Pearson would be able to deduct the payments.  Pearson filed a timely appeal from the judgment.

## II.  DISCUSSION

[¶20]  We address Pearson's arguments on appeal in turn.

### A.    Parental Rights and Responsibilities

[¶21]  Pearson makes four principal arguments that bear on the parental rights and responsibilities established in the divorce judgment: (1) that the court did not give proper deference and weight to prior orders issued in the case, (2) that the court erred in awarding sole parental rights and responsibilities to Wendell, (3) that the court improperly delegated decision-making authority over Pearson's contact rights to a third party, and (4) that the court's parental rights determination violated the children's constitutional rights to procedural due process.

### 1.    Effect of Prior Orders

[¶22]   Pearson contends that the prior orders issued in this case had a res judicata effect and barred relitigation of the issues addressed in those orders, or alternatively that they constitute the "law of the case," with a similar effect.  From this, Pearson argues that the court erred in adjudicating those issues de novo.  We disagree.

[¶23]  First, res judicata is a general doctrine that "prevents the relitigation of matters already decided."  *Portland Water Dist. v. Town of Standish*, 2008 ME 23, ¶ 7, 940 A.2d 1097.  Under its umbrella are two applications: issue preclusion, or collateral estoppel, and claim preclusion.  *Guardianship of Jewel M.*, 2010 ME 80, ¶ 39, 2 A.3d 301.  Here, Pearson contends that Wendell should have been collaterally estopped from presenting evidence about facts underlying prior orders in this action, and that the court was required to accept those prior orders and the findings therein.

[¶24]  A party is foreclosed from relitigating factual issues that have already been decided "if the identical issue was determined *by a prior final judgment*, and . . . the party estopped had a fair opportunity and incentive in an earlier proceeding to present the same factual issue or issues it wishes to litigate again in a subsequent proceeding."  *Id.* (alteration in original) (emphasis added) (quotation marks omitted).  We have held that "[p]rinciples of res judicata must be applied with

caution in domestic relations cases" because of changing developments that affect a child's best interests. *Id.* ¶ 41; *cf. Preston v. Tracy*, 2008 ME 34, ¶¶ 12, 15, 942 A.2d 718 (holding that a finding that a party willfully misused the protection from abuse process was not binding on the court in a subsequent divorce action because, "when determining parental rights and responsibilities, a court . . . must make an independent examination of the totality of the circumstances after hearing fresh evidence").

[¶25] Here, at the time of the final hearing in December 2014, none of the prior orders constituted a final judgment. Although the March 2013 order was originally issued as a final judgment on the grant of the divorce itself and on parental rights and responsibilities, the nature and effect of that order changed in March 2014 when, with the parties' agreement, the court vacated the judgment and correctly recharacterized it, and all subsequent orders, as interim orders. *See Gulesian v. Gulesian*, 377 A.2d 119, 120 (Me. 1977) (holding that an order pending divorce is not a final judgment that creates a right of appeal). Accordingly, the doctrine of collateral estoppel was inapplicable, and none of the orders, including the one issued in October 2013, had a preclusive effect.

[¶26] Pearson's alternative argument is that the prior orders contained the "law of the case," and that they were therefore entitled to deference. For two reasons, this argument fails. First, the "law of the case" doctrine "relates only to

questions of law." *Blance v. Alley*, 404 A.2d 587, 589 (Me. 1979).  Here, Pearson argues that the court should have deferred to prior findings and conclusions with respect to the best interests of the parties' children.  However, because the best interest analysis is not a pure question of law, *see* 19-A M.R.S. § 1653(3) (requiring the court to make factual findings related to various statutory factors), the "law of the case" doctrine does not apply dispositively, and the court did not err in admitting evidence of events predating the October 2013 order that bore on the issue of parental rights.  *See Blance*, 404 A.2d at 589.

[¶27]  Second, the "law of the case" doctrine embodies a jurisprudential policy that does not implicate a court's adjudicative authority.  *Id.*  Rather, the policy "promotes the orderly conduct of the action[,] . . . avoids unseemly conflict[, and] . . . discourages judge-shopping."  *Id.*  In this case, none of these laudable goals was more important than a full exposition of the facts necessary to allow the court to adjudicate issues affecting children in crisis.  Once the venue of this action was changed to a court location that was a considerable distance away from the earlier proceedings, it was nearly inevitable that a different judge— unfamiliar with the parties' history of deep conflict that judicial efforts had not resolved—would preside over the trial.  The parties then agreed that the March 2013 order and all subsequent orders would be treated as interim orders, which stripped those orders of any doctrinally preclusive effect.  This made it difficult, if

not impossible, for the judge who presided at the final hearing to gain a full understanding of the complicated dynamics of the case based on the cold record, without hearing the evidence firsthand. Therefore, with no meaningful alternative, and faithful to the principle that circumstances affecting a child's best interests can evolve over time, *see Guardianship of Jewel M.*, 2010 ME 80, ¶ 41, 2 A.3d 301, the court properly and sensibly approached the issues in the case de novo.

[¶28] While rejecting Pearson's argument that the evidence presented at the December 2014 trial should be limited to events that post-dated the October 2013 order, the court made clear that it had reviewed the court file and was familiar both with the difficult family history and the prior findings and adjudications adverse to Wendell, which is the material that Pearson wanted the court to consider. The court therefore was fully aware of the background of the case as revealed in the court file. The court, however, did not err by adjudicating the parties' claims de novo.

2. Determination of Parental Rights and Responsibilities

[¶29] Pearson argues that the court erred in awarding sole parental rights and responsibilities to Wendell because, he contends, the court did not properly evaluate the factors germane to the best interests of the children. *See* 19-A M.R.S. § 1653(3). We review a court's factual findings that bear on the best interest evaluation for clear error and the court's "ultimate conclusion regarding [a] child's

16

best interest for an abuse of discretion." *Grant v. Hamm*, 2012 ME 79, ¶ 6, 48 A.3d 789. We afford "very substantial deference" to the court because of its opportunity to evaluate the evidence as presented during trial. *Id.* (quotation marks omitted).

[¶30] Contrary to Pearson's contention, the court did not abuse its discretion when it concluded that the children's best interests would be promoted if Wendell were to have sole parental rights and responsibilities. This case illustrates that the courts are simply not able to provide stability and emotional protection to children caught between two parents who are unwilling or unable to stand down from their conflict with each other. Here, the court had imposed parenting orders of varying configurations: initially, shared parental rights and responsibilities with the children living primarily with Wendell; then allocated parental rights and responsibilities with the children not living together primarily; and finally sole parental rights and responsibilities to Pearson, who then abdicated primary physical residence of the children by unilaterally transferring them to Wendell. The parties' conduct ultimately frustrated the court's extensive efforts to provide judicial relief, and none of those prior efforts proved to be effective in deescalating parental conflict or insulating the children from its damaging effects.

[¶31] Particularly when viewed in light of the prior attempts to impose stability, the evidence supported the court's findings that Pearson and Wendell

continued to be unable to co-parent effectively for the benefit of their children; that the children's best interests militated toward an award of sole parental rights and responsibilities to one of the parties; that the children were in a more stable and emotionally healthy environment when they lived primarily with Wendell; and that parental rights and responsibilities therefore should be awarded to her. This is not a conclusion that Wendell has been free from fault but rather demonstrates that the court properly maintained its focus on the best interests of the children. This focus is apparent in the judgment itself, and, even more explicitly, in the court's order on Pearson's motion for further findings of fact and conclusions of law, where the court confirmed that it had considered the factors prescribed in section 1653(3) in making its best interest determination. Although Pearson vigorously disputed the evidence underlying these elements of the court's syllogism, the court's factual findings are not clearly erroneous, and the court acted within its discretion when it ultimately concluded that granting Wendell sole parental rights and responsibilities would be in the children's best interest.

3. Pearson's Rights of Contact

[¶32]  Pearson next argues that the court erred in assigning responsibility to a counselor for establishing a schedule of his rights of contact with the children.

[¶33]  We have held that it is error for a court to delegate responsibility to a third party to decide when a parent can have contact with his children. *See Knight*

*v. Knight*, 680 A.2d 1035, 1038 (Me. 1996). In *Knight*, because one of the parties (the father) was serving a lengthy prison sentence, the parties contested his contact rights, and the court's judgment allowed him to have contact only if the children's guardian ad litem or other mental health professional determined that the children were "willing and ready" to see their father. *Id.* at 1036 (quotation marks omitted). On appeal, we held that the requirement of third-party approval for contact was error because it improperly "transfer[red] the court's responsibility for determining the best interest of the child to the therapist. Although the court can consider the expression of such an expert opinion by a therapist, the court cannot make the visitation outcome dependent upon that opinion." *Id.* at 1038.

[¶34] In the judgment at issue here, the court ordered the parties to engage in

> a therapeutic reunification process guided by a counselor . . . relating to the parties' ability to co-parent and the parties' ability to act in the children's best interests. It is through this process that a contact schedule will be developed for contact between [Pearson] and the parties' children. . . . The holiday schedule shall be determined as part of the therapeutic reunification process.

After prescribing a one-year term for the therapeutic reunification process, the judgment went on to provide, "During the one year counseling process [Wendell] shall be responsible for making sure that [Pearson] has time with the children both together and individually."

[¶35]  Pearson argues that the judgment transferred to a third party, i.e., the counselor, the ultimate responsibility for decisions affecting Pearson's rights of contact.  Because Pearson's construction of the judgment would violate our holding in *Knight*, we must examine the judgment to determine whether Pearson's construction is correct.  If the judgment is ambiguous but is amenable to a construction that renders it lawful, we will adopt that view of the order.  *See Harrigan v. Mason & Winograd*, 397 A.2d 514, 516 (R.I. 1979) (stating that a court order may be construed to make it "reasonable, effective and conclusive"); *cf. Town of Baldwin v. Carter*, 2002 ME 52, ¶¶ 9, 11-15, 794 A.2d 62 (construing a statute to preserve its constitutionality); *Irish v. Gimbel*, 1997 ME 50, ¶¶ 6, 13, 691 A.2d 664 (same).

[¶36]  The judgment did not unambiguously grant the counselor authority to determine Pearson's rights of contact with the children.  Rather, pursuant to the judgment, a contact schedule would be developed "through this [therapeutic reunification] process," in which both parties would engage with a counselor.  This arrangement is materially different from the one vacated in *Knight*, where a third person alone would have ultimately controlled whether the father could have any contact with his children.  Here, in contrast, the creation of a contact schedule is to be the product of a cooperative venture in which the parties themselves are among the principals.

[¶37] Additionally, the judgment assigns specific responsibility to Wendell to ensure that Pearson has contact with the children. This further demonstrates that the court did not give decision-making authority to the counselor, but rather that the counselor's role would be to "guide[]" the parties to a breakthrough in their conflict and to develop a capacity to co-parent effectively, including establishing Pearson's rights of contact. Therefore, even if the judgment is ambiguous because the internal dynamics of the process leading to a contact schedule were not fully explained, the judgment can be reasonably construed in a way that does not run afoul of our holding in *Knight*. Accordingly, we conclude that the court's creative approach to formulating a contact schedule was not error.

4.     Constitutional Rights of the Children

[¶38] Relying on *Miller v. Miller*, 677 A.2d 64 (Me. 1996), Pearson argues that the court's best interest determination impinged on the children's constitutional right to procedural due process because of the judgment's effect on their familial relationships.

[¶39] In *Miller*, the minor children of parties to a divorce action sought to become parties so that they would have an opportunity to advocate in favor of their "custodial interest[s]." *Id.* at 68-70. We held that the children did not have a constitutional right to be joined as parties based on their their right to procedural due process because "any" constitutional interest they might have would be

satisfied by the participation of a guardian ad litem, who would promote their best interests pursuant to the standards set out in 19 M.R.S.A. § 752(5) (Supp. 1995), even if the guardian ad litem's recommendation were inconsistent with the children's own preferences. *Miller*, 677 A.2d at 69-70.

[¶40] Our discussion in *Miller* does not support Pearson's claim. First, *Miller* did not hold that children of divorcing parents have the constitutional right to participate as a party would. *See id.* at 70; *see also* Levy, *Maine Family Law* § 6.3[6] at 6-34 (8th ed. 2013). Second, even if such a right exists, it is fulfilled by the court's overarching best interest analysis, in which the children's preference is one of many factors, none of which is dispositive. *See* 19-A M.R.S. § 1653(3)(C); *Knight*, 680 A.2d at 1038 (holding that a child's preference regarding parental contact is not "determinative" of the best interest analysis and that a court must "assess [a child's] best interest in light of" all statutory factors); Levy, *Maine Family Law* § 6.3[2] at 6-12 to 6-26. Here, as the court expressly confirmed, it made a determination of the children's best interests after giving full consideration to the factors set out in section 1653(3). During the trial, the parties presented considerable evidence that reflected, either directly or indirectly, the children's preferences about where they wanted to live and the nature of the contact they wanted to have with the respective parties. This allowed the court to take those preferences into account to the extent that the parties chose to present

such evidence. Finally, while *Miller* discussed the role of a guardian ad litem, Pearson makes clear in his brief that he is not arguing that the court was required to appoint a guardian ad litem for the final hearing.

[¶41] We therefore conclude that because the court's decision to grant sole parental rights and responsibilities to Wendell was predicated on a best interest analysis, the judgment did not violate any constitutional interest the children may have.

B. Spousal Support

[¶42] The court awarded Wendell monthly spousal support of $3,000, to terminate upon her remarriage or "cohabitation in the manner of marriage," or upon the death of either party. Pearson argues here that the court's spousal support order is not supported by substantial evidence. We review an order of spousal support for an abuse of discretion. *Jandreau v. LaChance*, 2015 ME 66, ¶ 14, 116 A.3d 1273.

[¶43] In its order on Pearson's Rule 52 motion, the court identified the bases for its spousal support order: the parties were married for more than twenty years; Pearson's annual income as an attorney is approximately $140,000; Wendell had not received employment income since around 2005 because of her responsibilities as the primary parent and homemaker; although each supported the other's education and development of earning potential, Wendell's support of

Pearson while he attended law school was more substantial than Pearson's similar support of Wendell; and Wendell's spousal support would be taxable, whereas Pearson would be entitled to deduct those payments. Thus, in its support analysis, the court properly considered a number of factors outlined in 19-A M.R.S. § 951-A(5), and each of its findings was supported by the evidence. Although Pearson argues that the court did not place enough weight on other evidence that he argues militates against its award of spousal support, the court's findings are sufficient to reveal the basis for its decision and to allow for meaningful appellate review, and it was not required to provide an additional explanation. *See Finucan v. Williams*, 2013 ME 75, ¶ 15, 73 A.3d 1056 (explaining that a court must state the factors leading to its decision on spousal support but need not "detail its rationale" if the findings inform the parties of the reasons for the decision and allow appellate review (quotation marks omitted)). Based on its assessment of the evidence, the court's award of spousal support was not an abuse of discretion.

C.    Attorney Fees

[¶44]  In its judgment, the court ordered that Pearson pay Wendell $20,000 in attorney fees "as part of his spousal support obligation." This supplemented an order issued by the court prior to trial requiring Pearson to pay $10,000 in attorney fees. After the court issued its judgment, Pearson moved for the court to issue

findings of fact and conclusions of law on, among other things, attorney fees,[4] arguing that most of Wendell's attorney fees were attributable to her "need for substantial attention over a brief period of time," presumably rather than for legitimate legal representation.[5] This may be charitably viewed as a challenge to the reasonableness of the fees that Wendell sought and the court awarded.[6] *See Nadeau v. Nadeau*, 2008 ME 147, ¶ 59, 957 A.2d 108 (when the court determines that a party in a divorce proceeding is entitled to an award of attorney fees, it must determine a reasonable sum). Pearson argues here that the court erred by failing to issue findings in support of its award of attorney fees in response to his Rule 52 motion, and awarding fees in an amount that was unreasonable.

[¶45] A court is authorized to issue an award of reasonable attorney fees based on a determination of "the parties' relative capacity to absorb the costs of litigation . . . as well as all relevant factors that serve to create an award that is fair and just under the circumstances." *Miele v. Miele*, 2003 ME 113, ¶ 15, 832 A.2d 760 (citations omitted) (quotation marks omitted); *see also* 19-A M.R.S.

---

[4] Pearson's motion, which spanned eleven pages, primarily focused on parental rights and responsibilities and the claimed constitutional rights of the children, but in it, he also included a brief passage that argumentatively mentioned attorney fees.

[5] During the four-year period in which this action was pending, both parties were represented by several attorneys, and there were interim periods when each party was unrepresented.

[6] A party who frames a Rule 52 motion in this way runs the risk of violating the standards set out in *Wandishin v. Wandishin*, 2009 ME 73, ¶ 20, 976 A.2d 949 (cautioning parties about invoking a "tone" in a Rule 52 motion that is "inappropriate and ineffective").

§ 105(1) (2014) (providing that a court may order a party in a domestic relations case to pay "reasonable" attorney fees). In its order on Pearson's Rule 52 motion, the court issued findings to support its award of spousal support. As is noted above, findings of fact and conclusions of law supporting an award of spousal support are sufficient when they apprise the parties of the factual and legal basis for the court's decision and allow effective appellate review. *Finucan*, 2013 ME 75, ¶ 15, 73 A.3d 1056. Because, in the judgment, the court characterized the award of additional attorney fees as a form of spousal support, *see* 19-A M.R.S. § 952(1)(D) (2014), those findings are sufficient to explain the justification for an award of support in the form of attorney fees, just as they are an articulation of the reasons for the court's award of monthly support.

[¶46] Beyond that, although the court's order on Pearson's Rule 52 motion did not include a compartmentalized finding that the amount of the attorney fees award was reasonable, the findings in both the judgment and the order on Pearson's motion reasonably extend to that issue. In both the judgment and the order on Pearson's motion, the court discussed the long, contentious, and complicated history that bears on the issues central to this action, particularly as those issues relate to the children. The court's discussion encompassed both the facts themselves and the significance of those facts as applied to the governing legal principles. Those findings and conclusions, although presented in the context

of other issues, were sufficient to apprise the parties of the reasons why the amount of attorney fees awarded to Wendell was reasonable under the circumstances. The court was not required to further elucidate its rationale. *See Wandishin v. Wandishin*, 2009 ME 73, ¶ 19, 976 A.2d 949.

[¶47] The determination of attorney fees is a factual matter, *Efstathiou v. Efstathiou*, 2009 ME 107, ¶ 17, 982 A.2d 339, which we review for an abuse of discretion, *Kezer v. Cent. Me. Med. Ctr.*, 2012 ME 54, ¶ 28, 40 A.3d 955. Just as the court did not err in its award of monthly spousal support, the record does not demonstrate that the court erred in its assessment that an award of attorney fees was both justified by Wendell's financial circumstances and within Pearson's ability to pay, despite his arguments to the contrary. Further, Wendell's request for an award of attorney fees was properly supported,[7] *see Miele*, 2003 ME 113, ¶ 17, 832 A.2d 760; Levy, *Maine Family Law* § 9.2 at 9-3 to 9-5, and derived from legal services provided by an attorney who entered her appearance in this case, which had been pending for nearly four years, not long before it was initially scheduled for the final hearing, likely necessitating significant and expedited review and

---

[7] Shortly after the December 2014 trial, Wendell's attorney submitted an affidavit referring to her decades of experience in the practice of law and her hourly rate, which she stated was lower than that of similarly situated attorneys. She also offered to submit billing details for the court's in camera review. *See Miele v. Miele*, 2003 ME 113, ¶ 17, 832 A.2d 760 (noting that a request for attorney fees is properly supported when accompanied by an affidavit attesting to "counsel's customary hourly rate . . . and other such basic facts . . . as necessary to allow the court" to determine whether the fee amount is reasonable (quotation marks omitted)).

preparation. The award of attorney fees as provided in the judgment did not exceed the court's discretion.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Suzanne E. Thompson, Esq., Vincent, Kantz, Pittman & Thompson, Portland, for appellant Arn H. Pearson

David J. Van Dyke, Esq., Lynch & Van Dyke P.A., Lewiston, for appellee Mary Lou Wendell

Portland District Court docket number FM-2013-1222
FOR CLERK REFERENCE ONLY